**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence Rosen, Esq. (LR 5733)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
pkim@rosenlegal.com
lrosen@rosenlegal.com

Lead Counsel For Lead Plaintiff and Class

RECEIVED
11 MAY 11 PM 6:01
U.S. DISTRICT COURT
S.D.N.Y.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

DENNIS J. ANGELERI, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

v.

DAYL W. PEARSON; MICHAEL I. WIRTH; CHRISTOPHER LACOVARA; SAMUEL P. FRIEDER, C. TURNEY STEVENS; and KOHLBERG CAPITAL CORPORATION,

Defendants.

---------------------------------------------------------------X

CASE No.: 09-CV-10609 (MGC)

CLASS ACTION

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Lead Plaintiff John Ferrell, individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Consolidated Amended Class Action Complaint (the "Complaint") the following upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Kohlberg Capital Corporation ("Kohlberg" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of

defendants' public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning the Company; (d) information readily obtainable on the Internet; and (e) interviews of several witnesses with personal knowledge of the relevant facts. Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to defendants or are exclusively within their control.

## I. NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all persons and entities other than defendants, who purchased the securities of Kohlberg between May 7, 2008 and December 15, 2009, inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of federal securities laws (the "Class").

2. Kohlberg is an internally managed, non-diversified, closed-end investment company that has elected to be regulated as a Business Development Corporation ("BDC") under the Investment Company Act of 1940 (the "1940 Act").

3. Kohlberg relied on leverage through a credit facility to grow its assets and increase its returns to investors. As a BDC regulated by the 1940 Act, Kohlberg was required to maintain an asset to debt coverage ratio of at least 200%, otherwise, as Kohlberg noted in its 2008 10-K filed with the SEC on March 16, 2009, the Company "will be severely limited in [its] ability to raise capital to make new investments."

4. Kohlberg's lifeblood was its secured credit facility of $275 million. The credit facility required a one-to-one ratio between GAAP[1] total stockholders' equity and total borrowings. Had the Company not met this requirement, the Company would have been in breach of the credit facility terms.

5. Against this backdrop, the Defendants engaged in an accounting fraud by materially overstating the value of the Company's assets, i.e. its investments. This accounting fraud made the Company's balance sheets and income statements materially false and misleading.

6. On May 28, 2010 the Company materially restated its asset valuations for each quarterly and annual report issued during the Class Period. A restatement is a drastic remedy that is only applicable when financial statements were false when made.

7. The restatement adjustments ranged as high 561%.

8. Had Kohlberg not inflated its asset valuations, the Company would have maintained an asset coverage ratio below 200%, and the Company would have been in breach of the terms of its credit facility. Stated differently, absent accounting fraud, the Company would have been severely restricted in its ability to raise new funds and grow its business.

9. When details about the Company's improper valuation of its assets began to enter the market beginning on November 9, 2009 and continuing through December of 2009, rather than admit that it had dramatically overvalued assets, the Company issued false reassurances to investors about its efforts to work with its auditor Deloitte & Touche LLP ("Deloitte"). Deloitte later expressly denied these assertions.

---

[1] Generally Accepted Accounting Principles.

10. Not surprisingly, the SEC opened an informal investigation of Kohlberg concerning its valuation of the Company's assets. The SEC investigation, which has become a formal investigation, is ongoing.

## II. JURISDICTION AND VENUE

11. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

12. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

13. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District.

14. In connection with the acts, conduct and other wrongs alleged herein, defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III. PARTIES

15. Court-appointed lead plaintiff John Ferrell purchased Kohlberg common stock during the Class Period and has suffered damages as a result. His PSLRA certification was previously filed with the Court and is incorporated herein by reference.

16. Defendant Kohlberg is a Delaware corporation with its principal executive offices located at 295 Madison Avenue, 6th Floor, New York, New York 10017.

17. Kohlberg originates, structures, and invest in senior secured term loans, mezzanine debt and equity securities primarily in privately –held middle market companies, *i.e.* companies with EBIDTA[2] of $10 million to $50 million and/or total debt of $25 million to $150 million.

18. Also, Kohlberg through its wholly-owned portfolio company, Katonah Debt Advisors and its affiliates (collectively "Katonah"), manage collateralized loan obligations ("CLO") funds that invest in broadly syndicated loans, high-yield bonds and other corporate credit instruments. Katonah earns recurring management fees and other fees for its management and advisory services. Kohlberg also invests in CLO securities managed by Katonah.

19. At all relevant times herein, the Company's common stock was traded on the NASDAQ under ticker "KCAP."

20. Defendant Dayl W. Pearson ("Pearson"), at all relevant times herein, was and is the Company's Chief Executive Officer, President and a Director. Pearson has served as the Company's President and CEO since December 2006 and has served on the Company's Board since June 2008.

21. Defendant Michael I. Wirth ("Wirth"), at all relevant times herein, was and is the Company's Chief Financial Officer, Chief Compliance Officer, Secretary and Treasurer. Wirth joined the Company in November 2006 as CFO, Chief Compliance Officer and Executive Vice President.

22. Defendant Christopher Lacovara ("Lacovara"), at all relevant times herein, was and is the Company's Chairman of the Board of Directors, a Vice President of the Company and Chairman of the Board's Valuation Committee. Lacovara, at all relevant times herein, was and is a Vice President and a member of the Management Committee of Katonah.

---

[2] Earnings before interest, taxes, depreciation and amortization.

23. Defendant Samuel P. Frieder ("Frieder"), at all relevant times herein, was and is the Company Vice President. Frieder has been a member of the Company's Board of Directors since December 2006 and served on the Board's Valuation Committee.

24. Defendant C. Turney Stevens ("Stevens"), was and is a member of the Company's Board of Directors since December 2006, and served on the Board's Valuation Committee.

25. Pearson, Wirth, Lacovara, Frieder, and Stevens are collectively referred to hereinafter as the "Individual Defendants."

**A. The Valuation Committee**

26. According to the Company's 2008 10-K filed with the SEC on March 16, 2009, the "Board of Directors is ultimately and solely responsible for making a good faith determination of the fair value of portfolio investments on a quarterly basis."

27. Debt and equity securities that are not publicly traded or whose market price is not readily available are valued by the Board of Directors based on inputs of (among other things) management and the Valuation Committee.

28. Valuation of 100% of the investment portfolio is conducted at the end of each fiscal quarter.

**B. *Respondeat Superior* Liability**

29. Kohlberg is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

30. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Kohlberg under respondeat superior and agency principles.

## IV. DEFENDANTS' OMISSIONS AND MISREPRESENTATIONS OF MATERIAL FACT

### A. Kohlberg's 2008 Financial Results are Materially False and Misleading

#### i. First Quarter Ended March 31, 2008

31. The Class Period begins on May 7, 2008 when the Company issued a false and misleading press release announcing the Company's first quarter 2008 financial results. In the income statement portion of the press release, the Company reported under the line item Net Change of Affiliate Asset Manager Investments (i.e. Katonah) of $3,876,740; and a net increase in net assets resulting from operations of $195,252.

32. These inaccurate figures were repeated in the Company's first quarter 10-Q filed with the SEC on May 9, 2008.

33. The above financial information was materially false and misleading for the following reasons:

(A) On December 15, 2009 the Company filed an 8-K with the SEC entitled "Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report of Completed Interim Review." The 8-K stated that the Company's financial statements for the fiscal year ended December 31, 2008 in the Company's 10-K for such fiscal year and Deloitte's completed interim reviews for the Company's first and second quarterly reports for 2009 filed with the SEC should no longer be relied upon and had to be restated.

(B) On December 24, 2009, the Company filed an amended 8-K amending the December 15, 2009 8-K, attaching Deloitte's response letter to the December 15, 2009 8-K. The letter states in relevant part:

> We note that the Company provided Deloitte with (1) a revised valuation of the Company's loan portfolio investments as of December 31, 2008 and (2) a preliminary draft Form 10-Q which includes restatement disclosure. The revised valuation reflects a material reduction in the fair value of the Company's loan portfolio investments as of December 31, 2008 from the value included in the Company's financial statements for the fiscal year ended December 31, 2008 in the Company's Annual Report on Form 10-K for such fiscal year. For purposes of clarification, we note that we were informed on December 15, 2009 that certain Board members had not seen the details of the revised valuation results.
>
> * * *
>
> As Deloitte advised the Company on December 10, 2009, in Deloitte's current view, the Company's financial statements for the fiscal year ended December 31, 2008 and the Company's financial statements for the interim periods ended March 31, 2009 and June 30, 2009 contain material misstatements based on information recently provided by the Company concerning its valuation methodologies and procedures under SFAS 157. Accordingly, Deloitte now believes the information supporting the fair values reflected in the Company's previously issued 2008 and interim 2009 financial statements was and continues to be incomplete and inaccurate.

(C) On May 28, 2010 the Company filed its report for fiscal year 2009 on Form 10-K with the SEC. In the 10-K the Company admitted it had to restate its "financial information for each of the four quarters for 2008 as well as for the quarterly periods ended March 31, 2009 and June 30, 2009" and its fiscal year ended December 31, 2008 financial results. The Company also admitted that the "restatement" was required to "correct errors" in the application of GAAP. The 10-K states in relevant part:

> Following our engagement of Grant Thornton, we and our Audit Committee concluded that the we would have to restate our previously issued financial statements for the year ended December 31, 2008 (and the quarterly periods included in such year) as well as the quarterly periods ended March 31, 2009 and June 30, 2009. We and our Audit Committee determined that such restatement was necessary to correct errors in the application of accounting for the fair value of our illiquid investments and the revenue recognition for certain non-cash PIK[3] investments, which errors impact the amount of unrealized gains (losses) reported for our illiquid investments, which affects the calculation of our NAV and net income, and also impact net investment income as well as the cost basis and the net change in unrealized appreciation on certain non-cash PIK investments. In connection with the restatement, we

[3] Payment-in-kind.

have revised the valuation procedures applied to our illiquid investments and our accounting for our non-cash PIK investments.

(D) Because the Company admitted that its financial statements had to be "restated" to correct "errors" the financial statements were false when issued. Restatements are required for material accounting errors that existed at the time financial statements were prepared. Statement of Financial Accounting ("SFAS") 154.

(E) According to the Company's May 28, 2010 restatement filings with the SEC, Q1 2008 press release and Q1 10-Q are materially overstated as follows:

| Three Months Ended March 31, 2008 | | COMPUTED | | |
|---|---|---|---|---|
| | ORIGINAL | ADJUSTMENT | RESTATED | % Overstated (Understated)[4] |
| REALIZED & UNREALIZED GAINS (LOSSES) ON INVESTMENTS: | | | | |
| NET CHANGE IN UNREALIZED GAINS (LOSSES) ON: | | | | |
| AFFILIATE ASSET MANAGER INVESTMENTS | $3,876,740 | $ (898,502) | $ 2,978,238 | 30.2% |
| NET REALIZED & UNREALIZED (DEPRECIATION) ON INVESTMENTS | $(8,581,019) | $ (772,645) | $ (9,353,664) | (9%) |
| NET INCREASE (DECREASE) IN NET ASSETS RESULTING FROM OPERATIONS | $ 195,252 | $ (772,645) | $ (577,393) | (396%) |

34. The 10-Q filed in May 2008 was signed by defendants Pearson and Wirth who each separately certified that they were accurate pursuant to the Sarbanes-Oxley Act of 2002 (the "SOX Certification").

35. The first quarter 2008 10-Q also falsely stated that, after review by defendants Pearson and Wirth (i) the Company's disclosure controls were effective; and (ii) that the Company

---

4 The percentage overstated was determined by dividing the adjustment with the restated amount. The percentage understated determined by dividing the adjustment by the originally reported amount.

had no material changes in its internal control over financial reporting and did not have any material weaknesses.

36. The Company's statements about the effectiveness of its internal controls were also materially false and misleading for the following reasons:

(A) In the Company's 2009 annual report on form 10-K filed with the SEC on May 28, 2010, the Company admitted it did not maintain effective internal controls for each interim period in 2008, the fiscal year 2008 and the reporting periods in 2009. The 10-K states in relevant part:

> Management has evaluated the effectiveness of the Company's internal control over financial reporting based on the criteria in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). **Based on this evaluation under the criteria in Internal Control-Integrated Framework, management has concluded that, as of December 31, 2008 and December 31, 2009, the Company's internal control over financial reporting was not effective in providing reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with GAAP because of the material weaknesses related to ineffective controls over the accounting for the fair value of illiquid investments and revenue recognition for certain non-cash PIK investments.**
>
> The Company did not maintain effective controls over the accounting for the fair value of its illiquid investments and revenue recognition for certain non-cash PIK investments. Specifically, the Company's internal control over financial reporting was not properly designed to implement an appropriate valuation methodology and procedures to value the Company's illiquid investments consistent with the requirements of *Fair Value Measurements and Disclosures* as required by GAAP because the Company's prior valuation procedures did not adequately take into account certain market inputs and other data as well as the impact of broader market activity on the fair value of the Company's illiquid investments. In addition, the Company did not properly account for the income of certain non-cash PIK investments. **This control deficiency relating to the fair value of the Company's illiquid investments resulted in a material misstatement in their fair value and resulted in the restatement of the Company's financial statements for the year ended December 31, 2008 (and the quarterly periods included in such year) as well as the quarterly periods ended March 31, 2009 and June 30, 2009.** The control deficiency relating to revenue recognition for certain non-cash PIK investments resulted in the material misstatement of interest income and resulted in the restatement of the Company's financial statements for the quarterly periods ended March 31, 2009 and June 30, 2009.

> The Company did not maintain effective controls over its independent review of the fair value model valuation process. Specifically, the Company did not independently review (i) the appropriateness of the inputs and assumptions used in the model to produce the Company's financial statements; and (ii) the accuracy and consistency of the calculations of the outputs used from the model to produce the Company's financial statements. Because of this control deficiency, there is a reasonable possibility that a material misstatement of the Company's financial statements will not be prevented, or detected and corrected, on a timely basis.
>
> Based on the facts set forth above, management has concluded that these control deficiencies constitute material weaknesses.

**ii. Second Quarter Ended June 30, 2008**

37. On August 6, 2008 the Company issued a press release containing false and misleading statements announcing its second quarter 2008 financial results. In the income statement for the second quarter, the Company reported net change in unrealized losses on debt securities of ($329,631); net change in unrealized gains on affiliate asset manager investments (i.e. Katonah) of $823,747; net increase in net assets resulting of operation of $7,297,285.

38. These inaccurate figures were repeated in the Company's second quarter 10-Q filed with the SEC on August 11, 2008.

39. The second quarter 2008 financial information was materially false and misleading for the same reasons set forth above in ¶ 33. According to the Company's May 28, 2010 SEC filings, the figures were overstated as follows:

| Three Months Ended June 30, 2008 | | COMPUTED | | |
|---|---|---|---|---|
| | ORIGINAL | ADJUSTMENT | RESTATED | % Overstated (Understated)[5] |
| REALIZED & UNREALIZED GAINS (LOSSES) ON INVESTMENTS: | | | | |
| NET CHANGE IN UNREALIZED GAINS (LOSSES) ON: | | | | |
| DEBT SECURITIES | $ (329,631) | $ (665,781) | $ (995,412) | (201%) |
| AFFILIATE ASSET MANAGER INVESTMENTS | $ 823,747 | $ (340,701) | $ 483,046 | (70.5%) |
| NET REALIZED & UNREALIZED (DEPREIATION) ON INVESTMENTS | $ (361,375) | $ (1,006,482) | $ (1,367,857) | (275%) |
| NET INCREASE (DECREASE) IN NET ASSETS RESULTING FROM OPERATIONS | $ 7,297,285 | $ (1,006,482) | $ 6,290,803 | 16% |

40. The Company's presentation of its financial statements for the six months ended June 30, 2008 in the press release and 10-Q were as overstated as follows:

| Six Months Ended June 30, 2008 | | COMPUTED | | |
|---|---|---|---|---|
| | ORIGINAL | ADJUSTMENT | RESTATED | % Overstated (Understated)[6] |
| REALIZED & UNREALIZED GAINS (LOSSES) ON INVESTMENTS: | | | | |
| NET CHANGE IN UNREALIZED GAINS (LOSSES) ON: | | | | |
| DEBT SECURITIES | $ (8,075,608) | $ (539,923) | $ (8,615,531) | (6.7%) |
| AFFILIATE ASSET MANAGER INVESTMENTS | $ 4,700,487 | $ (1,239,203) | $ 3,461,284 | 35.8% |
| NET REALIZED & UNREALIZED (DEPREIATION) ON INVESTMENTS | $ (8,942,393) | $ (1,779,126) | $ (10,721,519) | (19.9%) |
| NET INCREASE (DECREASE) IN NET ASSETS RESULTING FROM OPERATIONS | $ 7,492,537 | $ (1,779,126) | $ 5,713,411 | 31.1% |

---

[5] The percentage overstated was determined by dividing the adjustment with the restated amount. The percentage understated determined by dividing the adjustment by the originally reported amount.

[6] The percentage overstated was determined by dividing the adjustment with the restated amount. The percentage understated determined by dividing the adjustment by the originally reported amount.

41. The second quarter 2008 10-Q was signed by defendants Pearson and Wirth who each separately certified their accuracy pursuant to SOX.

42. Like the first quarter 10-Q, this 10-Q falsely stated that after review by defendants Pearson and Wirth: (i) the Company's disclosure controls were effective; and (ii) that the Company had no material changes in its internal control over financial reporting and did not identify any material weaknesses.

43. In addition to the restatement adjustments for the second quarter noted above, the Company's disclosures about its effective internal and disclosure controls for the second quarter of 2008 were materially false and misleading for the same reasons set forth in ¶36, above.

**iii. Third Quarter Ended September 30, 2008**

44. On November 10, 2008 the Company issued a press release announcing its third quarter ended 2008 financial results. In the income statement for the third quarter, the Company falsely reported: net change in unrealized gains on affiliate asset manager investments (i.e. Katonah) of $128,634; and net increase in net assets resulting of operation of $3,988,536.

45. These inaccurate figures were repeated in the Company's third quarter 10-Q filed with the SEC on the same day.

46. The third quarter financial information was materially false and misleading for the same reasons set forth above in ¶ 33. According to the Company's May 28, 2010 SEC filings, the third quarter 2008 financial information was overstated as follows:

| Three Months Ended September 30, 2008 | ORIGINAL | COMPUTED ADJUSTMENT | RESTATED | % Overstated (Understated)[7] |
|---|---|---|---|---|
| REALIZED & UNREALIZED GAINS (LOSSES) ON INVESTMENTS: | | | | |
| NET CHANGE IN UNREALIZED GAINS (LOSSES) ON: | | | | |
| AFFILIATE ASSET MANAGER INVESTMENTS | $ 128,634 | $ (483,004) | $ (354,370) | (375%) |
| NET REALIZED & UNREALIZED (DEPREIATION) ON INVESTMENTS | $ (3,465,808) | $ (576,646) | $ (4,042,455) | (16.6%) |
| NET INCREASE (DECREASE) IN NET ASSETS RESULTING FROM OPERATIONS | $ 3,988,536 | $ (576,646) | $ 3,411,889 | 16.9% |

47. The Company's presentation of its financial statements for the nine months ended September 30, 2008 in the press release and 10-Q were as overstated as follows:

| Nine Months Ended September 30, 2008 | ORIGINAL | COMPUTED ADJUSTMENT | RESTATED | % Overstated (Understated)[8] |
|---|---|---|---|---|
| REALIZED & UNREALIZED GAINS (LOSSES) ON INVESTMENTS: | | | | |
| NET CHANGE IN UNREALIZED GAINS (LOSSES) ON: | | | | |
| AFFILIATE ASSET MANAGER INVESTMENTS | $ 4,829,121 | $ (1,722,208) | $ 3,106,913 | 55.4% |
| NET REALIZED & UNREALIZED (DEPREIATION) ON INVESTMENTS | $ (12,408,202) | $ (2,355,774) | $ (14,763,976) | (19%) |
| NET INCREASE (DECREASE) IN NET ASSETS RESULTING FROM OPERATIONS | $ 11,481,073 | $ (2,355,774) | $ 9,125,299 | 25.8% |

7 The percentage overstated was determined by dividing the adjustment with the restated amount. The percentage understated determined by dividing the adjustment by the originally reported amount.

8 The percentage overstated was determined by dividing the adjustment with the restated amount. The percentage understated determined by dividing the adjustment by the originally reported amount.

48. The third quarter 2008 10-Q was signed by defendants Pearson and Wirth who also separately certified that they were accurate pursuant to SOX.

49. Like the first quarter 10-Q, this 10-Q falsely stated that after review by defendants Pearson and Wirth: (i) the Company's disclosure controls were effective; and (ii) the Company had no material changes in its internal control over financial reporting and did not identify any material weaknesses.

50. In addition to the restatement adjustments for the third quarter noted above, the Company's disclosures about its effective internal and disclosure controls are materially false and misleading for the same reasons set forth in ¶ 36, above.

**iv. Fiscal Year Ended December 31, 2008**

51. On March 16, 2009 the Company issued a press release announcing false and misleading financial results for the Company's fourth quarter and fiscal year ended 2008. Concurrent with the filing of the press release the Company filed a FY 2008 10-K with the SEC—including the same false financial information contained in the press release. The financial information reported in the press release and 10-K was materially false and misleading because the Company later admitted that its financial statements were materially inaccurate and had to be restated, as set forth above in ¶ 33.

52. The Company overstated the following line items in its income statement for the fiscal year ended December 31, 2008:

| Fiscal Year Ended December 31, 2008 | ORIGINAL | ADJUSTMENT | RESTATED | % Overstated (Understated)[9] |
|---|---|---|---|---|
| REALIZED & UNREALIZED GAINS (LOSSES) ON INVESTMENTS: | | | | |
| DEBT SECURITIES | $ (26,887,293) | $ (30,627,104) | $ (57,514,397) | (114%) |
| EQUITY SECURITIES | $ (575,129) | $ 699,535 | $ 124,406 | (122%) |
| CLO FUND SECURITIES MANAGED BY AFFILIATE | $ (3,693,724) | $ (17,296,236) | $ (20,989,960) | (468%) |
| CLO FUND SECURITIES MANAGED BY NON-AFFILIATES | $ (1,006,371) | $ (4,699,000) | $ (5,705,371) | (467%) |
| AFFILIATE ASSET MANAGER INVESTMENTS | $ (7,535,548) | $ (1,793,276) | $ (9,328,824) | (23.8%) |
| NET REALIZED & UNREALIZED (DEPREIATION) ON INVESTMENTS | $ (40,273,244) | $ (53,716,081) | $ (93,989,325) | (133%) |
| NET (DECREASE) IN NET ASSETS RESULTING FROM OPERATIONS | $ (9,567,327) | $ (53,716,081) | $ (63,283,408) | (561%) |

53. The balance sheet at December 31, 2008 was materially overstated as follows:

| At the Fiscal Year Ended December 31, 2008 | ORIGINAL | ADJUSTMENT | RESTATED | % Overstated (Understated)[10] |
|---|---|---|---|---|
| ASSETS | | | | |
| INVESTMENTS AT FAIR VALUE: | | | | |
| DEBT SECURITIES | $ 384,486,111 | $ (30,627,104) | $ 353,859,007 | 8.7% |
| CLO FUND SECURITIES MANAGED BY NON-AFFILIATES | $ 9,099,000 | $ (4,699,000) | $ 4,400,000 | 107% |
| CLO FUND SECURITIES MANAGED BY AFFILIATE | $ 47,536,236 | $ (17,296,236) | $ 30,240,000 | 57.2% |
| EQUITY SECURITIES | $ 4,389,831 | $ 699,534 | $ 5,089,365 | 13.7% |
| TOTAL INVESTMENTS AT FAIR VALUE | $ 514,225,272 | $ (53,716,082) | $460,509,190 | 11.7% |

[9] The percentage overstated was determined by dividing the adjustment with the restated amount. The percentage understated determined by dividing the adjustment by the originally reported amount.

[10] The percentage overstated was determined by dividing the adjustment with the restated amount. The percentage understated determined by dividing the adjustment by the originally

54. The 10-K was signed by defendants Pearson, Wirth, Lacovara, Frieder and Stevens. Pearson and Wirth separately certified the accuracy of the 10-K pursuant to SOX.

55. Like the first quarter 10-Q, the 10-K falsely stated that after review by defendants Pearson and Wirth: (i) the Company's disclosure controls were effective; and (ii) the Company's internal controls were effective.

56. In addition to the restatement adjustments for the fiscal year ended 2008, the Company's disclosures about its effective internal and disclosure controls are materially false and misleading for the same reasons set forth in ¶ 36, above.

**B. Kohlberg's Financial Results For the First, Second and Third Quarters of 2009 are Materially False and Misleading**

**i. First Quarter Ended March 31, 2009**

57. On May 8, 2009 the Company issued a press release announcing its first quarter ended March 31, 2009 financial results that was materially false and misleading. The inaccurate financial information reported in the press release was repeated in the Company's first quarter 10-Q filed with the SEC on May 11, 2009.

58. The first quarter financial information was materially false and misleading and had to be restated as set forth above in ¶ 33. Additionally, the Company overstated its balance sheet at the end of the first quarter 2009 as follows:

---

reported amount.

| At March 31, 2009 | ORIGINAL | ADJUSTMENT | RESTATED | % Overstated (Understated)[11] |
|---|---|---|---|---|
| ASSETS | | | | |
| INVESTMENTS AT FAIR VALUE: | | | | |
| DEBT SECURITIES | $ 361,867,183 | $ (29,127,751) | $ 332,739,432 | 8.8% |
| CLO FUND SECURITIES MANAGED BY NON- AFFILIATES | $ 5,347,000 | $ (867,000) | $ 4,480,000 | 19.4% |
| CLO FUND SECURITIES MANAGED BY AFFILIATE | $ 44,440,236 | $ (10,900,236) | $ 33,540,000 | 32.5% |
| TOTAL INVESTMENTS AT FAIR VALUE | $ 474,362,485 | $ (42,581,848) | $ 431,780,637 | 9.9% |
| TOTAL ASSETS | $ 495,686,991 | $ (42,581,848) | $ 453,105,143 | 9.4% |

59. The first quarter 2009 10-Q was signed by defendants Pearson and Wirth who each separately certified its accuracy pursuant to SOX.

60. The first quarter 2009 10-Q falsely stated that after review by defendants Pearson and Wirth: (i) the Company's disclosure controls were effective; and (ii) the Company had no material changes in its internal control over financial reporting and did not identify any material weaknesses.

61. In addition to the restatement adjustments for the first quarter of 2009, the Company's disclosures about its effective internal and disclosure controls are materially false and misleading for the same reasons set forth in ¶ 36, above.

**ii. Second Quarter Ended June 30, 2009**

62. On August 10, 2009 the Company issued a press release announcing false and misleading second quarter 2009 financial results. The inaccurate financial information reported in the press release was repeated in the Company's second quarter 2009 10-Q filed that same day.

[11] The percentage overstated was determined by dividing the adjustment with the restated amount. The percentage understated determined by dividing the adjustment by the originally

63. The second quarter 2009 financial information was materially false and misleading for the same reasons set forth above in ¶ 33. Additionally, the Company overstated its balance sheet at the end of the second quarter 2009 as follows:

| At June 30, 2009 | ORIGINAL | ADJUSTMENT | RESTATED | % Overstated (Understated)[12] |
|---|---|---|---|---|
| | | | | |
| ASSETS | | | | |
| INVESTMENTS AT FAIR VALUE: | | | | |
| CLO FUND SECURITIES MANAGED BY NON- AFFILIATES | $ 3,588,000 | $ (237,000) | $ 3,351,000 | 7.1% |
| CLO FUND SECURITIES MANAGED BY AFFILIATE | $ 52,865,236 | $ (13,955,236) | $ 38,910,000 | 35.9% |
| TOTAL INVESTMENTS AT FAIR VALUE | $ 462,787,392 | $ (26,445,137) | $ 436,342,255 | 6.1% |
| TOTAL ASSETS | $ 477,693,317 | $ (26,445,137) | $ 451,248,181 | 5.9% |

64. The second quarter 2009 10-Q was signed by defendants Pearson and Wirth who each separately certified to its accuracy pursuant to SOX.

65. The second quarter 2009 10-Q falsely stated that after review by defendants Pearson and Wirth: (i) the Company's disclosure controls were effective; and (ii) the Company had no material changes in its internal control over financial reporting and did not identify any material weaknesses.

66. In addition to the restatement adjustments for the second quarter of 2009, the Company's disclosures about its effective internal and disclosure controls are materially false and misleading for the same reasons set forth in ¶ 36, above.

---

reported amount.

[12] The percentage overstated was determined by dividing the adjustment with the restated amount. The percentage understated determined by dividing the adjustment by the originally

**iii. Third Quarter Ended June 30, 2009**

67. On November 9, 2009, the Company issued an announcement setting forth certain of its third quarter 2009 financial results. According to the announcement, the Company had net investment income of $4.4 million and $17.9 million for the three months and nine months ended September 30, 2009.

68. These results were materially false and misleading because according to the Company's May 28, 2010 10-Q filed with the SEC, the Company's actual net investment income was $3,476,632 and $15,689,592, for the three and nine months ended September 30, 2009—demonsttating that the Company's overstated net investment income by 26.6% and 14.1%, for the three and nine months ended September 30, 2009.

## V. TRUTH SLOWLY EMERGES, DAMAGING INVESTORS

69. In the same November 9, 2009 announcement revealing the Company's false third quarter 2009 results, the Company announced that it would be delaying the issuance of its third quarter ended September 30, 2009 financial results on form 10-Q because the Company's auditor Deloitte, had raised certain questions regarding the Company's valuation determinations for its investment portfolio. The announcement states in relevant part:

> Kohlberg Capital Corporation Delays Filing of Third Quarter Report on Form 10-Q
>
> NEW YORK, Nov. 9, 2009 (GLOBE NEWSWIRE) -- Kohlberg Capital Corporation (Nasdaq:KCAP) (the "Company") has delayed the release of its full earnings results for the quarter ended September 30, 2009 while it is in discussion with its independent public accountants, Deloitte & Touche LLP ("Deloitte"), **regarding valuation determinations under Statement of Financial Accounting Standards No. 157 -- Fair Value Measurements ("SFAS 157") included in its financial statements for the fiscal year ended December 31, 2008 (the "December 31, 2008 financial statements") and for subsequent interim periods in 2009. The Company has been informed by Deloitte that**

---

reported amount.

> **as a result of an annual internal inspection process, certain questions have been raised by Deloitte regarding the Company's methodology and process of valuing its loan portfolio investments under SFAS 157.** Deloitte has requested information in addition to that which was previously provided by the Company for purposes of its review. Deloitte issued an unqualified opinion on the December 31, 2008 financial statements, which was included in the Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission on March 16, 2009.
>
> **Because the Company's financial statements for the quarter ended September 30, 2009 incorporate its balance sheet as of December 31, 2008, the finalization and filing of the Company's quarterly report on Form 10-Q for the third quarter of 2009 will be delayed. Accordingly, the Company will be unable to file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2009 by today's deadline, and it intends to file a Notification of Late Filing on Form 12b-25 with the Securities and Exchange Commission....**

70. This announcement caused the Company's stock price to fall from $5.52/share to $4.96/share or 10.1% on November 9, 2009, on extraordinary volume.

71. On December 15, 2009 the Company filed with the SEC an 8-K announcing that its previously issued financial statements for the fiscal year ended December 31, 2008 and for the first two quarters of fiscal 2009 should no longer be relied upon.

72. In an effort to falsely reassure investors, the Company misleadingly stated that it was continuing to work with its auditor, Deloitte & Touche LLP, in order to resolve these issues. The 8-K states in relevant part:

> Item 4.02. Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.
>
> (b) Kohlberg Capital Corporation (the "Company") previously disclosed in its Current Report on Form 8-K/A dated November 9, 2009 and Form 12b-25 dated November 9, 2009 that it was unable to timely file its Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2009 due to ongoing discussions with Deloitte & Touche LLP ("Deloitte"), the Company's independent public accountants, of the application of certain accounting standards relating to valuation determinations under Statement of Financial Accounting Standards No. 157—Fair Value Measurements ("SFAS 157") included in its financial statements for the fiscal year ended December 31, 2008 in the Company's Annual

Report on Form 10-K for such fiscal year and its financial statements for the interim quarterly periods ended March 31, 2009 and June 30, 2009 in the Company's Quarterly Reports on Form 10–Q for those respective periods (collectively, the "Financial Statements"). As previously disclosed, the discussions with Deloitte commenced following an internal inspection process by Deloitte of its audit of the Company's financial statements for the fiscal year ended December 31, 2008 as a result of which certain questions were raised by the Deloitte employees conducting the internal inspection regarding Deloitte's documentation of the methodology and procedures used to prepare the valuations reflected in the December 31, 2008 financial statements. As a result, certain questions were then raised by Deloitte regarding the Company's methodology and procedures for valuing its loan portfolio investments under SFAS 157. As also previously disclosed, Deloitte then requested supplemental information from the Company beyond that which was previously requested by Deloitte and provided by the Company for purposes of its prior review of each of the Financial Statements and preparation of its opinion covering the Financial Statements for the fiscal year ended December 31, 2008. The Company provided such additional information and has engaged in an ongoing dialogue with Deloitte with respect to alternative methodologies and procedures that would be acceptable to Deloitte in valuing the Company's investments under SFAS 157.

**The Company continues to provide additional information to Deloitte as it is requested by Deloitte and continues to review and discuss with Deloitte valuation methodologies and procedures that would be appropriate to meet the requirements of SFAS 157 and fairly reflect the value of the Company's investments as of December 31, 2008, March 31, 2009 and June 30, 2009.** However, after a thorough review of, and ongoing dialogue with Deloitte regarding, the valuation methodologies and procedures that the Company currently believes would be acceptable to Deloitte, to date the Company has been unable to conclude that such alternative methodologies and procedures meet the requirements of SFAS 157 and fairly reflect the value of the Company's investments as of December 31, 2008, March 31, 2009 and June 30, 2009. Duff & Phelps, LLC, an independent valuation firm, that had provided third party valuation consulting services to the Company's Board of Directors in connection with the Company's Financial Statements for the fiscal year ended December 31, 2008 and for the quarterly period ended March 31, 2009, participated in certain of the discussions with Deloitte as part of the ongoing dialogue referred to above and continued to express its view in such discussions that, based upon the procedures performed by Duff & Phelps at the time of its review of the Company's valuation methodology and procedures in connection with the preparation of such Financial Statements and its understanding of the provisions of SFAS 157, the valuation methodology and procedures used by the Company did not appear to be unreasonable.

Deloitte issued an unqualified opinion on the Company's December 31, 2008 financial statements, which was included in the Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission on March 16, 2009. The Company is not aware of any allegation or belief by Deloitte that the information provided by the Company to Deloitte at the time of the preparation of the Financial Statements regarding the Company's valuation

> methodology and procedures was incomplete or inaccurate or omitted any information requested by Deloitte at such time. **On December 10, 2009, the Company and its management were advised by Deloitte that (i) the audit report issued by Deloitte accompanying the Company's financial statements for the fiscal year ended December 31, 2008 in the Company's Annual Report on Form 10-K for such fiscal year and (ii) Deloitte's completed interim reviews of the Company's financial statements for the interim periods ended March 31, 2009 and June 30, 2009 in the Company's Quarterly Reports on Form 10–Q for those respective periods should no longer be relied upon because Deloitte had changed its position with respect to the appropriateness of the methodology and procedures used by the Company under SFAS 157 to value the Company's investments as of the end of each of those periods and, as a result, the Company has been informed that Deloitte now believes, based upon such changed position and the additional information provided to Deloitte by the Company following Deloitte's internal inspection process, that such Financial Statements contain material misstatements with respect to the value of the Company's investments included therein.** Accordingly, the Financial Statements should not be relied upon until the foregoing matters are resolved.
>
> The Company's management, the Company's Audit Committee and Deloitte have discussed the matters disclosed in this filing.
>
> (c) The Company has provided Deloitte with a copy of this Current Report on Form 8–K and has requested that Deloitte furnish a letter as promptly as possible addressed to the Commission stating whether Deloitte agrees with the statements made by the Company in response to this Item 4.02 and, if not, stating the respects in which it does not agree.

73. The December 15, 2009 announcement, however, did not state that the Company's interim third quarter 2009 results reported in its November 9, 2009 announcement should not relied upon.

74. On December 24, 2009[13] the Company filed with the SEC a letter, dated December 23, 2009, that Deloitte & Touche LLP provided to the SEC responding and disagreeing with the representations in the Company's December 15, 2009 8-K filed with the SEC. The letter states in relevant part:

---

[13] The stock market closed on at 1 p.m. on December 24, 2009—Chirstmas Eve.

December 23, 2009

United States Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-7561

Dear Sirs/Madams:

We have read Item 4.02(b) of Form 8-K of Kohlberg Capital Corporation (the "Company") dated December 15, 2009 (the "December 15, 2009 Form 8-K") and have the following comments:

Except as discussed in the following sentences we agree with the statements made in the first paragraph. **In the first paragraph, the Company asserts that certain information was "previously disclosed" in the Company's Current Report on Form 8-K/A dated November 9, 2009 (the "November 9, 2009 8-K/A") and Form 12b-25 dated November 9, 2009 (the "Form 12b-25"); we note that the information in the December 15, 2009 Form 8-K differs in some respects from the information disclosed in the November 9, 2009 8-K/A and the Form 12b-25.** We refer to the November 9, 2009 8-K/A and Form 12b-25 for their contents. **Accordingly, we disagree with the Company's statement that such information was previously disclosed.** In addition with respect to the fifth sentence of the first paragraph, **we disagree with the Company's statement that it "provided such additional information and has engaged in an ongoing dialogue with Deloitte" for the reasons stated in our response to the first sentence of the second paragraph set forth below.** For purposes of clarity, we also note **that the Company is responsible for the preparation of financial statements that present the Company's financial position, operations, changes in net assets and cash flows in accordance with U.S. Generally Accepted Accounting Principles, including FASB Statement of Financial Accounting Standards No. 157 — *Fair Value Measurements* ("SFAS 157"),** and that such financial statements should not be prepared solely on the basis of what "would be acceptable to Deloitte."

**We disagree with the statement made in the first sentence of the second paragraph. Management essentially ceased providing substantive information to Deloitte on December 14, 2009. Significant unanswered questions and unfulfilled information requests remain outstanding.**

We have no basis to agree or disagree with the statement made in the second sentence of the second paragraph. **We note that the Company provided Deloitte with (1) a revised valuation of the Company's loan portfolio investments as of December 31, 2008 and (2) a preliminary draft Form 10-Q which includes restatement disclosure. The revised valuation reflects a material reduction in the fair value of the Company's loan portfolio investments as of December 31, 2008 from the value included in the Company's financial statements for the fiscal year ended December 31, 2008 in the Company's**

**Annual Report on Form 10-K for such fiscal year. For purposes of clarification, we note that we were informed on December 15, 2009 that certain Board members had not seen the details of the revised valuation results.**

We agree with the statement made in the third sentence of the second paragraph, insofar as it does reflect statements made by Duff & Phelps, LLC ("Duff & Phelps") in discussions with Deloitte; however, we have no basis on which to agree or disagree with the characterization of Duff & Phelps as being "independent" of the Company. Further, we previously informed the Company that we did not agree with the view of Duff & Phelps.

We agree with the statement made in the first sentence of the third paragraph.

**We disagree with the statement made in the second sentence of the third paragraph. As Deloitte advised the Company on December 10, 2009, in Deloitte's current view, the Company's financial statements for the fiscal year ended December 31, 2008 and the Company's financial statements for the interim periods ended March 31, 2009 and June 30, 2009 contain material misstatements based on information recently provided by the Company concerning its valuation methodologies and procedures under SFAS 157. Accordingly, Deloitte now believes the information supporting the fair values reflected in the Company's previously issued 2008 and interim 2009 financial statements was and continues to be incomplete and inaccurate.**

We agree with the statements made in the third and fourth sentences of the third paragraph and in the single sentence of the fourth paragraph.

Very truly yours,

/s/ Deloitte & Touche LLP

cc: Michael Wirth, Chief Financial Officer
Albert Pastino, Chairman of the Audit Committee of the Board of Directors

75. The December 24, 2009 8-K caused the Company's stock to fall 8.5% or $0.44/share over the next two trading days.

76. On May 28, 2010 the Company filed with the SEC: (a) its long overdue annual report for the fiscal year ended December 31, 2009 which also contained the restatements to the Company's fiscal year ended December 31, 2008 financial results; (b) restated 10-Qs for the first

two quarters ended 2009; and the (c) its overdue 10-Q for the third quarter ended September 30, 2009.

## VI. ADDITIONAL FACTS SUPPORTIVE OF FALSITY AND SCIENTER

77. The magnitude and breadth of the restatement adjustments support a strong inference of scienter. The restatement adjustments ranged as high as 561% and the larger relative restatement adjustment concerned line items relating to the Company's wholly owned subsidiary Katonah—whose primary business and expertise in valuing and investing in securities.

78. Additionally, as a Business Development Corporation, the Company used borrowed funds to make investments and to attempt to increase returns to shareholders by reducing the overall cost of capital. Under the 1940 Investment Company Act of 1940, the Company was limited in the amount of leverage it could incur. The Company was only allowed to borrow amounts such that its asset coverage equals at least 200% after such borrowing, i.e. total assets are at least double of total borrowings. If the minimum asset coverage ratio was not met, the Company's ability to raise capital or make new investments would be severely impaired until the asset coverage ratio returned to above 200%. Had the Company not overstated its assets during the Class Period it would not have maintained an asset coverage ratio above 200%.

79. The Company's borrowing was made through a secured credit facility with a maximum borrowing capacity of $275 million. Under the credit facility terms, the Company was required to maintain a one to one ratio of the outstanding balance to the Company's most recently reported GAAP stockholders' equity balance (determined quarterly in conjunction with the Company's financial reporting filings with the Securities and Exchange Commission) as of the Facility outstanding balance determination date. Had the Company not overstated the value of its

investments, the Company would have been in material breach of the credit facility. Such a beach such a breach may have resulted in termination of the credit facility and a requirement that the Company immediately repay all of its borrowings thereunder.

80. Kohlberg admitted in its May 28, 2010 SEC filings that the Company failed to follow GAAP and its own accounting policies (which stated that the Company policies comported with SFAS 157) in connection with the valuation of its assets.

81. The Company's auditor Deloitte made clear that the Company affirmatively lied to investors about its efforts to work with Deloitte to resolve the accounting problems and provide accurate financial information to investors. These lies were intended to, and did, cover up the Company's failure to address accounting problems leading to the restatement.

82. Deloitte's December 23, 2009, letter revealed that the certain members of the Company's board were not provided copies of preliminary restated valuations of the Company's loan portfolio investments contained in the Company's draft 10-Q (for the Third Quarter 2009). According to the Company's SEC filings, the Board of Directors was ultimately responsible for the valuation of the Company's assets. This gives the strong impression that management affirmatively misled certain members of the Board of Directors to prevent them from becoming aware of their scheme to misstate the financial statements.

83. As set forth above, on November 9, 2009, the Company issued an announcement stating that its third quarter ended September 30, 2009 10-Q would be delayed due to questions raised about the valuation of the Company's assets. Yet, knowing there were issues relating to valuation of the Company's assets, the Company issued preliminary Q3 financial results of net investment income of $4.4 million and $17.9 million for the three months and nine months ended

September 30, 2009, respectively. These results were restated when the Company's filed its Q3 2009 10-Q with the SEC on May 28, 2010; which revealed that the November 9, 2009 announcement had overstated net investment income by 26.6% and 14.1%, for the three and nine months ended September 30, 2009, respectively.

84. The Company is now the subject of a formal investigation by the SEC Division of Enforcement concerning the matters giving rise to the restatement. The formal investigation started as an informal inquiry in January 11, 2010 concerning the valuation methodology used by the Company to value its investments. On April 30, 2010, the SEC advised the Company that the informal investigation had been elevated to a formal investigation. In connection with the formal investigation a subpoena was issued to the Company by the SEC. The formal investigation is ongoing.

85. The assessment and valuation of assets was core to the Company's business and operations. This already important aspect of the Company's business was further heightened by the credit crisis.

## VII. PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

86. At all relevant times, the market for Kohlberg's common stock was an efficient market for the following reasons, among others:

(a) Kohlberg's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) During the class period, an average of 694,188 shares of Kohlberg's stock were traded on a weekly basis, representing approximately 3.2% of all outstanding shares[14], demonstrating a very strong presumption of an efficient market;

(c) As a regulated issuer, Kohlberg filed with the SEC periodic public reports during the Class Period;

(d) Kohlberg regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e) Kohlberg was followed by several securities analysts, including but not limited to Oppenheimer & Co., JPM Securities, and BMO Capital Markets, employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

(f) As a regulated issuer Kohlberg filed with the SEC periodic public reports and met the market criterion for the filing of S-3 registration statements with the SEC during the Class Period. More than 75 NASD member firms were active market-makers in Kohlberg stock at all times during the Class Period; and

(g) Unexpected material news about Kohlberg was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

---

[14] According to the Company's 2008 10-K filed with the SEC on March 16, 2009, as of March 16, 2009 there were 21,570,869 shares outstanding.

87. As a result of the foregoing, the market for Kohlberg's common stock promptly digested current information regarding Kohlberg from all publicly available sources and reflected such information in Kohlberg's stock price. Under these circumstances, all purchasers of Kohlberg's common stock during the Class Period suffered similar injury through their purchase of Kohlberg's common stock at artificially inflated prices, and a presumption of reliance applies.

## VIII. PLAINTIFF'S CLASS ACTION ALLEGATIONS

88. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased the securities of Kohlberg during the Class Period and who were damaged thereby. Excluded from the Class are defendants, the current and former officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

89. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Kohlberg's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds of members in the proposed Class. Members of the Class may be identified from records maintained by Kohlberg or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

90. Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

91. Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

92. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether the misstatements and omissions alleged herein were made with scienter;

(c) whether statements made by the Individual Defendants to the investing public during the Class Period misrepresented and/or omitted material facts about the business, prospects, sales, operations and management of Kohlberg; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

93. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX. FIRST CLAIM: Violation of Section 10(b) of The Exchange Act Against and Rule 10b-5 Promulgated Thereunder Against All Defendants

94. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

95. This First Claim is asserted against defendants Kohlberg and the Individual Defendants.

96. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase and/or sell Kohlberg securities at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, individually and as a group, took the actions set forth herein.

97. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Kohlberg as specified herein.

98. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Kohlberg's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Kohlberg and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Kohlberg's securities during the Class Period.

99. Each of the Defendants' primary liability, and controlling person liability, arises from the following facts: (1) defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of the defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each of the defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; (4) each of the defendants was aware of the Company's dissemination of information to the investing public that they knew or recklessly disregarded was materially false and misleading; and (5) each of the defendants culpably participated in the wrongful conduct alleged herein.

100. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Kohlberg's financial condition and future business prospects from the investing public and supporting the artificially inflated or distorted price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's financial condition and business prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by

deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

101. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for Kohlberg's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Kohlberg's publicly-traded securities were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the Company's securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired and/or sold Kohlberg securities during the Class Period at artificially high prices and were damaged thereby.

102. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Kohlberg's financial results, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired Kohlberg securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

103. By virtue of the foregoing, the Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

104. As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

105. This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

## X. SECOND CLAIM: Violation Of Section 20(a) of The Exchange Act Against the Individual Defendants

106. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

107. This Second Claim is asserted against each of the Individual Defendants.

108. The Individual Defendants acted as controlling persons of Kohlberg within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of aspects of the Company's revenues and earnings and dissemination of information to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

109. In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

110. As set forth above, Kohlberg violated Section 10(b) and Rule 10b-5. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act as they culpably participated in the fraud alleged herein. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

111. This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action, designating Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: May 11, 2011

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
lrosen@rosenlegal.com
pkim@rosenlegal.com

Lead Counsel for Lead Plaintiff and Class

**CERTIFICATE OF SERVICE**

The undersigned certifies and declares as follows:

I am over the age of 18 and not a party to this action. My business address is 275 Madison Avenue, 34th Floor, New York, New York, 10016, which is in the county where the mailing described below took place.

On May 11, 2011, at New York, NY, I caused the within CONSOLIDATED AMENDED CLASS ACTION COMPLAINT to be served by first class U.S. mail to the following:

Daniel Jonathan Kramer, Esq.
Eric Alan Stone, Esq.
Leslie Gordon Fagen, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP (NY)
1285 Avenue of the Americas
New York, NY 10019

*Attorneys for defendants Kohlberg Capital Corporation*
*Dayl W. Pearson, Michael I. Wirth, Christopher Lacovara,*
*Samuel P. Frieder, and C. Turney Stevens*

I declare that I am employed in the office of a member of the bar of this court at whose direction service was made.

Executed May 11, 2011 in New York, New York.

Phillip Kim